**Opinion issued December 10, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-18-01106-CV**

———————————

**ROBERT L. MOODY, JR., Appellant**

**V.**

**NATIONAL WESTERN LIFE INSURANCE COMPANY; NATIONAL WESTERN LIFE GROUP, INC.; ROSS RANKIN MOODY; ELVIN JEROME PEDERSON; STEPHEN EDWARD GLASGOW; CHARLES D. MILOS; ERLE DOUGLAS MCLEOD; LOUIS EDWARD PAULS, JR.; AND FRANCES ANNE MOODY-DAHLBERG, Appellees**

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 17-CV-1196**

---

**O P I N I O N**

Robert L. Moody, Jr. filed a shareholder's derivative suit challenging business practices of National Western Life Insurance Company, a wholly owned subsidiary of National Western Life Group, Inc. Both the businesses and the individual board members filed pleas to the jurisdiction, which the trial court granted. The trial court also awarded the defendants a total of $1,314,053.73 in trial attorney's fees and expenses and up to $505,000 in appellate attorney's fees. In three issues on appeal, Moody Jr. challenges the rulings on the pleas to the jurisdiction, the award of fees and expenses, and the dismissal of a counterclaim.

We modify the judgment to condition the award of appellate attorney's fees on success in the appellate court, and as modified we affirm the trial court's judgment.

**Background**

## I.     The companies and the family

National Western Life Insurance Company ("National Western") was founded in 1956 by Robert L. Moody, who served as Chairman and Chief Executive Officer of the company until June 2015. National Western is incorporated in Colorado and has maintained its principal place of business in Austin, Texas since 1963. In 1968, National Western acquired by merger a company that had in force numerous policies insuring citizens of Central and South America. National Western

assumed these international policies and thereafter accepted by mail applications for insurance from residents of other countries. National Western took the position that it did not need to be licensed in other countries because it was licensed in Texas, received applications and issued policies in Texas, and worked only with independent international brokers.[1]

Robert L. Moody, Jr. ("Moody Jr.") is the eldest son of Robert L. Moody ("Moody Sr."). Moody Jr. owns Moody Insurance Group, Inc. ("Moody Insurance"), an insurance marketing business. By contract, both Moody Insurance and Moody Jr., individually, are "independent contractor" agents for National Western. They earn commissions for sales of National Western products based on standard commission schedules. Moody Jr. purchased shares of National Western between 2008 and January 1, 2012.

---

[1] In both its brochures and policies, National Western included disclamatory language about its sales to international residents.

> National Western Life Insurance Company offers a full line of life insurance and annuity products through general independent agencies in 49 states, the District of Columbia, four U.S. territories or possessions, and Haiti. The Company does not maintain offices in any other country, but it does accept applications at its Home Office in Austin, Texas from—and issues policies to—non-U.S. residents.
>
> As the Company makes no representation regarding the advisability, suitability, or legality of your application for, and purchase of, a policy from the Company, you should consult with your own independent advisors if you have questions.

3

Ross Rankin Moody is Moody Jr.'s younger brother, and he has been President and Chief Operating Officer of National Western since 2000. Other family members who serve on the board of directors of National Western include: Moody Jr.'s stepmother, Ann M. Moody; his half-sister, Frances A. Moody-Dahlberg; and his stepmother's brother, E. Douglas McLeod.

In the early 2000s, National Western's issuance of policies to non-U.S. residents increased steeply. Texas insurance regulators raised concerns about National Western's activities in Argentina and Russia. Based on advice of counsel, National Western responded in writing that it "does not market or solicit products in foreign countries" and that it works with independent brokers abroad.[2]

## II. The Brazilian enforcement action

In 2005, a Brazilian court entered a default judgment against National Western for wrongful refusal to pay a life insurance claim.[3] As a result of that judgment, the

---

[2] National Western's counsel also acknowledged that there was a "possibility of money laundering attempts" in various aspects of its business, and around 2002, National Western implemented an anti-money-laundering program. In addition, between 2000 and 2010, National Western developed new products for the international market, approval for which was obtained from Moody Sr. In January 2000, Moody Insurance executed its executive general agent contract with National Western.

[3] *See Naves v. Nat'l W. Life Ins. Co.*, No. 03-08-00525-CV, 2009 WL 2900755, at *1 (Tex. App.—Austin Sept. 10, 2009, pet. denied) (mem. op.). Naves later attempted to domesticate the judgment, but Texas courts concluded that the Brazilian court lacked jurisdiction over National Western. *Id.*

4

Brazilian regulatory authority ("SUSEP")[4] initiated an infraction proceeding against National Western, alleging that it had operated as an insurance company without due authorization. In 2011, SUSEP assessed an ex parte penalty in an amount equal to about $6 billion U.S.[5] When National Western learned of the fine in late October 2011, it obtained an additional legal opinion from a Brazilian law firm confirming its position that Brazilian law did not prohibit it from issuing policies to Brazilian residents or bring it within the jurisdiction of Brazilian authorities.

National Western disclosed the situation in 2011 and 2012 Securities and Exchange Commission filings. On advice of counsel, National Western appeared in the Brazilian infraction proceeding, and on further appeal the fine was reduced to approximately $960,000 U.S. National Western paid the fine without admitting liability and stopped selling insurance policies to Brazilian residents. Brazilian authorities then opened a criminal investigation regarding the sales of insurance to its residents.

---

[4] SUSEP is an acronym for the Portuguese term for the Superintendence of Private Insurance.

[5] SUSEP determined that it had jurisdiction over National Western, relying in part on National Western's website, which boasted that it had a presence in Brazil for 26 years. In imposing the $6 billion penal fine, SUSEP concluded that the independent, non-exclusive, commission-only Brazilian brokers constituted a "sales force" of National Western representatives.

Meanwhile, in 2013 National Western hired Price Waterhouse to study the feasibility of becoming licensed to sell insurance in Brazil. The study concluded it would not be profitable to operate in that manner because National Western's business advantage was the ability to denominate policies in stable U.S. dollars as opposed to the volatile Brazilian real.

## III.    Creation of the holding company

In March 2015, National Western Life Group, Inc. ("Group") was incorporated in Delaware.[6] National Western shares were converted one-for-one to shares in Group, which holds all of the currently issued stock of National Western. Group does not issue insurance or conduct any insurance business.

## IV.    A family matter

In 2016, National Western's audit committee discontinued some of Moody Jr.'s financial and in-kind benefits. In a series of text messages, Moody Jr. informed Ross of his opposition to these actions. The same year, Ross's daughter, Elizabeth, was appointed as Trustee of the Moody Foundation, the family charitable entity. Moody Jr., who had by then been thrice overlooked for appointment as trustee, also expressed his opposition to this appointment.

---

[6]    The restated certificate of incorporation provided for governance by a board of directors, whose liability was expressly limited: "[N]o director of [Group] shall be personally liable to [Group] or its stockholders for monetary damages for breach of fiduciary duty as a director."

## V.  The inquiry and the demand

In January 2017, Moody Jr.'s attorney sent a letter to Ross and National Western. The letter noted the SUSEP fine and proceeding, discounted National Western's jurisdictional defense, and questioned the company's decision to continue issuing insurance policies to non-U.S. residents. The letter also questioned Ross's "competency to serve on any board representing Moody family interests." The letter identified eight questions, most of which did not relate to National Western's sales to foreign residents or the SUSEP infraction proceeding.[7] The letter also threatened

---

[7]    The eight questions raised were:

1. In November of 2016, although you remained the CEO, you resigned your position as President of National Western. Were these matters, and your role in them, fully disclosed to the board before your resignation?

2. With regard to National Western, what was the Audit Committee's role in authorizing this conduct?

3. In November 2016, you were named to the board of directors for American National Insurance Company. Have these events, and your role in the events, been disclosed to the ANICO board? If not, why? Has this matter been brought to the attention of the ANICO ethics committee?

4. Both you and your daughter sit on the board of the Moody Foundation giving your direct family considerable control of this important Foundation. Have you disclosed this conduct to the rest of the family?

5. Has legal counsel disclosed your conduct to the following entities: (1) ANICO; (2) The Moody Foundation; (3) The Moody Endowment; or (4) Galtex Hotel Corporation?

6. Have you directly disclosed this information to John Smith, trustee at Moody National Bank for the benefit of Robert L. Moody, Sr.?

7. Why have you never disclosed your conduct to Robert L. Moody, Jr. or other family members?

the filing of a derivative suit. Counsel for Group contested the facts of Moody Jr.'s January 2017 letter and concluded that the matters raised in that letter related to Ross and the Moody family personally, not to National Western or Group.

In April 2017, Moody Jr. sent a demand letter to National Western and Group alleging that board members had breached their fiduciary duties. It focused on the enforcement action in Brazil, and it demanded that the boards of directors take eight corrective actions including: (1) removing Ross as Chairman and Chief Executive Officer of Group; (2) filing a civil action for breach of fiduciary duty against the board members; (3) making additional disclosures to shareholders; (4) ending sales without licenses in foreign jurisdictions; and (5) reimbursing Moody Jr. for attorney's fees and costs.[8]

## VI. The companies' response

The boards of directors of National Western and Group met jointly on June 6, 2017.[9] They considered available information pertaining to:

---

8. Has an independent investigation been conducted to determine the facts and assess the potential liability or impact on National Western on other parties and their trustees, shareholders and directors? If so, will you provide it to Bobby, Jr.?

[8] In the letter, Moody Jr. stated that by "making this demand," he did "not concede that the Board is disinterested and independent." He asserted that his intention was to permit the Board to take the necessary corrective action.

[9] The record of proceedings shows the individual board members who participated from Group: (1) three class A directors (David S. Boone, Stephen E. Glasgow, and E.J. Pederson); (2) six class B directors (Ross R. Moody, Ann M. Moody, Frances

(1)    discontinuation of benefits previously given to Moody Jr.;

(2)    legal standards relevant to a shareholder's demand and the filing of a derivative claim;

(3)    the history of National Western's international business model;

(4)    prior legal opinions regarding the international business model;

(5)    legal disclaimers in applications, policies, and brochures;

(6)    application of Brazilian law regarding the sale of insurance;

(7)    the historical practice of following advice of legal counsel;

(8)    the Price Waterhouse feasibility study about becoming licensed to sell insurance in Brazil;

(9)    Brazilian business practices that differ from American practices, including corruption and bribery;

(10)   the growth and profitability of the business over the time period when it made disclosures about the SUSEP proceeding;

(11)   the advantages and disadvantages to National Western and Group of filing of a lawsuit challenging the conduct of its boards of directors;

(12)   the relatively small size of the fine assessed by Brazilian authorities compared to 30 years of profit in that market;

(13)   Moody Jr.'s role in selling insurance on a commission basis;

(14)   Moody Jr.'s continued involvement with the international business and role as an executive general agent;

---

A. Moody-Dahlberg, E. Douglas McLeod, Charles D. Milos, Louis E. Pauls, Jr.); and (3) one advisory director (Russell S. Moody). Directors who attended on behalf of National Western directors were: Ross R. Moody, Stephen E. Glasgow, E.J. Pederson, David S. Boone, Brian M. Pribyl, and Rey Perez.

9

(15) the ongoing Brazilian criminal investigation; and

(16) Moody Jr.'s status as potential beneficiary of his father's significant interest in Group.

The boards concluded that no further investigation was necessary and that a suit by Group or National Western against its board of directors was not in the best interest of the business. The boards voted to reject all of Moody Jr.'s demands; Ross did not participate in the vote.

### VII.   Moody Jr. files this lawsuit

Moody Jr. filed a derivative suit based on the boards' refusal of his demands, and he sought damages and equitable relief, including attorney's fees. Moody Jr. made the following allegations:

- The boards failed to act in good faith and conduct a reasonable and independent investigation.[10]

- The directors were not independent and should have appointed an independent committee.

- The directors should have conducted interviews of board members and Brazilian agents, examined the evidence considered by SUSEP, and regarded inquiries from the Texas Department of Insurance about business in Argentina and Russia as red flags to prompt an investigation.

- The boards did not review the opinions of Brazilian officials or documents relevant to the history of doing business in Brazil.

---

[10] The suit is filed by Moody, Jr. derivatively on behalf of National Western and Group. The defendants are Ross Rankin Moody, Elvin Jerome Pederson, Stephen Edward Glasgow, Charles D. Milos, Earle Douglas McLeod, Louis Edward Pauls, and Frances Anne Moody-Dahlberg.

- The boards should have produced a written report and failed to obtain a legal opinion about conducting business in Brazil.[11]

- The defendant directors "failed to act in good faith or with the honest belief that their actions taken in approving the unlawful sale of insurance to international markets, was in the best interests of the company."

- The directors breached their fiduciary duties in relation to the sale of insurance policies in international markets without first having obtained licenses to sell insurance in each foreign country.[12]

---

[11] Moody Jr. relied on the conclusion of Brazilian officials that the independent brokers working in Brazil were actually employees of National Western.

[12] Moody Jr.'s live pleading alleges that the director defendants breached their fiduciary duties by:

(a) Knowingly or recklessly approving the unlawful sale of insurance in the country of Brazil resulting in a $6 billion fine to the company;

(b) Knowingly or recklessly approving the unlawful sale of insurance in other foreign jurisdictions including the countries of Taiwan, Venezuela and others without making a reliable determination of whether such conduct was, in fact, legal;

(c) Knowingly or recklessly placing policy holders and brokers in the country of Brazil in the position of violating criminal law by failing to inform brokers and policyholders that the purchase or sale of the company's insurance was illegal;

(d) Failing to obtain a full and comprehensive explanation of the requirements for doing business in Brazil, the ramifications of selling insurance in Brazil without a license, and the regulatory proceedings in Brazil and failing to take appropriate remedial actions; and

(e) Knowingly and recklessly engaging in a pattern and practice of continuing and repeated unlawful conduct, with regard to the sale of insurance in international markets, by failing to comply with foreign laws and regulations.

The director defendants answered with a general denial and affirmative defenses. National Western and Group pleaded a general denial and affirmative defenses, and they counterclaimed for (1) expenses under chapter 21 of the Texas Business Organizations Code and (2) breach of the managing general agent contract, which they contended barred Moody Jr. from filing the shareholder derivative suit.

Moody Jr. filed a general denial and pleaded affirmative defenses in response to the counterclaims. He also pleaded a claim for declaratory judgment construing the managing general agent contract. He specifically asked the trial court to declare that the managing general agent contract did not prevent him from instituting a shareholder derivative suit and that he did not breach the contract by filing a shareholder derivative suit. Moody Jr. sought attorney's fees for his declaratory judgment claim.

## VIII. Pleas to the jurisdiction

National Western and Group filed a plea to the jurisdiction asserting that Moody Jr. lacked standing to pursue the derivative action. They asserted three grounds for dismissal for lack of standing: (1) the agency contract prohibited Moody Jr. from suing on behalf of the companies; (2) Moody Jr.'s pleading was insufficient to show that the boards wrongfully refused his demand for action; and (3) Moody Jr. is not an adequate representative of Group stockholders, which is a standing requirement under applicable Delaware law.

12

The director defendants also filed a plea to the jurisdiction. They asserted that (1) Moody Jr. failed to plead facts sufficient to overcome the business judgment rule and show that the boards wrongfully refused his demand for action; (2) Moody Jr. is not an adequate representative of Group stockholders; and (3) Moody Jr. did not plead facts establishing that he had a continuous interest in National Western stock because the alleged wrong—selling insurance policies to Brazilian residents—began long before he acquired any National Western stock.

Moody Jr. filed a response to both pleas to the jurisdiction to which he attached only one exhibit, a photocopy of an article from the August 1987 *Texas Monthly* entitled, "The Sleaziest Man in Texas," about Moody Jr.'s uncle, Shearn Moody, Jr., who was charged with swindling the Moody Foundation. Moody Jr. relied on his pleadings and argued that he had pleaded particularized facts showing the boards breached their duty of care by investigating his demand in a grossly negligent way and that they had breached their duty of good faith by failing to appoint an independent and disinterested committee to investigate his demand and by deciding to refuse his demand.[13]

---

[13] Specifically, Moody Jr. argued that the boards acted with gross negligence by:

(1) failing to appoint an independent and disinterested committee;

(2) failing to interview potential fact witnesses;

The trial court granted both pleas to the jurisdiction. In doing so, it expressly concluded that additional repleading would be futile.

## IX. Attorney's fees and expenses

National Western and Group filed an application for expenses, including reasonable and necessary attorney's fees incurred in their defense and on behalf of the director defendants. They argued that the record demonstrated that the boards acted within the bounds of the business judgment rule and that text messages and

---

(3)    failing to refute the facts upon which SUSEP imposed the ex parte $6 billion fine; and

(4)    failing to include written legal opinions and written information about the ongoing criminal investigation in the materials presented to the board.

Moody Jr. argued that the boards did not act in good faith because the boards, which included many members of the extended Moody family, were not independent and disinterested. He also argued that the refusal of his demands was inexplicable and therefore in bad faith in light of the following facts:

(1)     the formation of Group as a holding company;

(2)    a comment from Standard & Poor's about governance deficiencies;

(3)    National Western relied on a jurisdictional defense in opposing the fine in Brazil;

(4)    the size of the initial fine;

(5)    discontinuation of sales to Brazilians;

(6)    the ongoing Brazilian criminal investigation.

Finally, he argued that the directors knowingly authorized unlawful business practices and that they faced a substantial threat of personal liability because their actions were illegal and in bad faith and therefore indemnity would not apply.

14

other evidence showed that the Moody Jr. was motivated by personal animus. To establish the amount of the expenses, they attached affidavits from three attorneys, who attested to the *Arthur Andersen* factors and proved up the accompanying contemporaneous billing statements as business records.[14] The application for expenses was set for an oral hearing.

Moody Jr. responded with a motion to vacate the trial court's order on the pleas to the jurisdiction. In that motion, he also replied to the request for expenses and attorney's fees. Moody Jr. asserted that National Western had defrauded the court by finalizing its exit from the international market while defending against the derivative suit.[15] One of Moody Jr.'s demands had been for National Western to leave the international market, and he argued that the company's action was an admission that the prior business model was illegal and unprofitable.

Moody Jr. argued that he was entitled to attorney's fees. He asserted that because his suit prompted National Western to leave the international market, it had conferred a benefit on the company by reducing the risk of criminal and regulatory penalties. He opposed the defendants' application for expenses on the grounds that:

---

[14]     *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 813 (Tex. 1997).

[15]     As proof, he attached an email indicating that National Western intended to finalize its exit from the international market on May 11, 2018. He argued that this was one of the demands in his April 17, 2017 demand letter. The email indicated that the move was made due to "severe changes in financial markets around the world which in turn [have] required an increased monitoring structure over the company."

(1) they had not shown that his suit was maintained without reasonable cause or for an improper purpose; (2) the attorney's fees affidavits were inadmissible hearsay; (3) he had not had an opportunity to conduct discovery on attorney's fees and expenses; and (4) a bench trial was required.

National Western and Group opposed Moody Jr.'s request for attorney's fees because "he achieved nothing through his lawsuit," "obtained nothing of value to the company," and "obtained none of the relief he requested." Group also reiterated its arguments that Moody Jr. filed his suit for an improper purpose and without reasonable cause.

Moody Jr. set his motion to vacate the pleas to the jurisdiction for hearing at the same date and time as National Western and Group's hearing on their application for expenses. The entirety of the one-hour hearing was occupied with argument of counsel on the motion to vacate. At the end of the hearing, the trial court took the matters under advisement and invited the parties to file supplemental briefing. Moody Jr. asserted that a bench trial on expenses was required and suggested resetting the application for attorney's fees for another time.[16] National Western and

---

[16] Moody Jr.'s counsel stated: "Your Honor, we do think it might be helpful, actually, to have some discussion about the attorneys' fees issue and the motion to transfer; and we believe that with respect to the attorneys' fees that a bench trial is actually required. And we would like the opportunity to have that discussion with you. So perhaps you could address the motion to vacate issue, and then we could reset these other things for another time."

Group argued that a summary disposition was appropriate.[17] The court responded: "I will review what you have put in writing, and I am not prepared to make a call off the top of my head on that, not having reviewed the law or your pleadings."

After the hearing, Moody Jr. filed supplemental briefing on his motion to vacate the pleas to the jurisdiction and on attorney's fees. In that document, he stated that he had objected to the application for expenses on the grounds that the affidavits are hearsay and a bench trial is required. He also argued that because the statute authorizing an award of attorney's fees does not mandate a particular procedure, the attorney's fee issue must be determined by summary judgment or trial. He did not specifically request a ruling on any evidentiary objection or whether a bench trial was required.

The trial court denied the motion to vacate the pleas to the jurisdiction. Without expressly finding that Moody Jr. filed suit without reasonable cause or for an improper purpose, the trial court granted the request for expenses.[18]

---

[17] Counsel for the companies responded: "Your Honor, just so we are clear, our position is, as set forth in our pleadings, that it's wrong on this idea for a bench trial. It's a matter of law, and the Court can decide all that on the papers."

[18] The trial court awarded the following:

- $522,055.50 for reasonable and necessary fees and expenses charged by Beck Redden LLP for investigation and defense of this matter on behalf of National Western;

The corporate and individual defendants jointly moved for entry of final judgment and set the motion for hearing. They argued that the granting of the pleas to the jurisdiction mooted National Western and Group's counterclaim for damages for breach of the managing general agent contract and Moody Jr.'s declaratory judgment claim about the same contract. They also argued that Moody Jr.'s declaratory judgment claim was improper because it was "merely the mirror image" of the breach of contract claim.

Moody Jr. objected to the proposed final judgment in writing, arguing that: (1) he had paid the jury fee and was entitled to a jury trial on attorney's fees; (2) he was entitled to an opportunity for discovery on attorney's fees; and (3) the dismissal of his counterclaims would deny him due process.

---

- $36,200 for reasonable and necessary fees and expenses charged by S.R. Lewis, Jr. in investigation and defense of this matter on behalf of National Western;

- $755,798.23 for National Western's indemnification of the director defendants;

- Reasonable and necessary appellate attorneys' fees of $250,000 in the event of any appeal to the intermediate court of appeals;

- $65,000 for a petition for review in supreme court;

- $125,000 for appellate fees for Texas Supreme Court merits briefs; and

- $65,000 for oral argument at the Texas Supreme Court.

The trial court entered final judgment dismissing the contract claims and awarding the attorney's fees as previously ordered. Moody Jr. appealed.

**Analysis**

On appeal, Moody Jr. raises three issues, complaining of: (1) the trial court's ruling on the pleas to the jurisdiction; (2) the trial court's award of attorney's fees; and (3) the trial court's dismissal of his counterclaim for a declaratory judgment construing the managing general agent contract.

I.      **The trial court correctly granted the pleas to the jurisdiction because Moody Jr. failed to plead with particularity facts showing that the boards wrongfully refused his demands.**

A.      **Standard of review**

Standing is a component of subject-matter jurisdiction that focuses on the question of who may bring an action. *Vernco Constr., Inc. v. Nelson*, 460 S.W.3d 145, 149 (Tex. 2015); *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). "Courts lack subject-matter jurisdiction to adjudicate disputes initiated by parties lacking standing." *Vernco Constr.*, 460 S.W.3d at 149. Whether a court has subject-matter jurisdiction is a question of law. *Id.*; *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004); *see Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("The demand requirements of Rule 23.1 represent a procedural restatement of these bedrock principles of Delaware law of

19

corporate governance in the context of *standing* to maintain a derivative shareholder's suit.").

A party may challenge a trial court's subject-matter jurisdiction by filing a plea to the jurisdiction. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We review a trial court's ruling on a plea to the jurisdiction de novo. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019) (citing *Miranda*, 133 S.W.3d at 226); *cf. Brehm*, 746 A.2d at 254 (courts review de novo claims of pleading sufficiency under Delaware Court of Chancery Rule 23.1).

Ordinarily a plea to the jurisdiction challenges the plaintiff's pleadings, asserting that the alleged facts do not affirmatively demonstrate the court's jurisdiction. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). We "construe the plaintiff's pleadings liberally, taking all factual assertions as true, and look to the plaintiff's intent." *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012). A plea to the jurisdiction may also challenge the existence of jurisdictional facts, and when it does, the parties may present evidence. *Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 635. "When a jurisdictional issue is not intertwined with the merits of the claims, which is the case here, disputed fact issues are resolved by the court, not the jury." *Vernco Constr.*, 460 S.W.3d at 149.

When a plea to the jurisdiction challenges the existence of jurisdictional facts, "a trial court's review of a plea to the jurisdiction mirrors that of a traditional summary judgment motion." *Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 635. The movant must present summary-judgment proof demonstrating that the court lacks jurisdiction. *Id.* The burden then shifts to the nonmovant to show that there is a disputed material fact on the jurisdictional issue. *Id.*; *see* TEX. R. CIV. P. 166a(c) (to prevail on a traditional summary judgment motion, the movant must establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law).

## B.    Delaware law applies

"In a derivative action brought on behalf of a Delaware corporation, Delaware law applies to substantive issues, and Texas law governs procedural matters and remedies." *Lapiner v. Maimon*, 429 S.W.3d 816, 823 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see* TEX. BUS. ORGS. CODE § 21.562(a), 21.562; *Neff v. Brady*, 527 S.W.3d 511, 523 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("[T]he 'internal affairs doctrine' provides that, with respect to foreign entities, the laws of the entity's jurisdiction of formation govern its internal affairs.").

The business and affairs of a Delaware corporation are managed by or under the direction of a board of directors, who owe to the corporation fiduciary duties of loyalty and care. DEL. CODE tit. 8, § 141(a); *Stone v. Ritter*, 911 A.2d 362, 370 (Del.

21

2006). The duty of loyalty, which encompasses the duty of good faith, requires that directors pursue the best interests of the corporation. *See id.*; *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 53 (Del. 2006); *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Failure to act in good faith may be shown with evidence that a director acted for "some purpose other than a genuine attempt to advance corporate welfare," or knowingly violated an applicable positive law. *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996). The duty of care requires directors to "inform themselves, before making a business decision, of all material information reasonably available to them." *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), aff'd, 906 A.2d 114 (Del. 2006). Director liability is predicated on concepts of gross negligence, which is "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[19] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008); *see Stone*, 911 A.2d at 370; *Walt Disney*, 906 A.2d at 53; *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). "[C]ompliance with a director's duty of care can never appropriately be judicially determined by reference to *the content of the board*

---

[19] The reckless indifference element refers to a reckless indifference to or deliberate disregard of the stockholders. *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 970 (Del. Ch. 1986) (acknowledging that this formulation creates a "higher threshold for liability than does the definition of gross negligence in general tort law").

decision that leads to a corporate loss, apart from consideration of the good faith or rationality of the process employed." *Caremark*, 698 A.2d at 967.

A stockholder's derivative suit is "an action in which the individual shareholder steps into the shoes of the corporation and usurps the board of directors' authority to decide whether to pursue the corporation's claims." *In re Crown Castle Int'l Corp.*, 247 S.W.3d 349, 355 (Tex. App.—Houston [14th Dist.] 2008, no pet.). "The derivative action developed in equity to enable shareholders to sue in the corporation's name where those in control of the company refused to assert a claim belonging to it." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm*, 746 A.2d at 244. Because a derivative suit "impinges on the managerial freedom of directors," a stockholder's right to pursue a derivative suit is "limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone*, 911 A.2d at 366–67.

Delaware Court of Chancery Rule 23.1 imposes on the would-be derivative plaintiff a heightened pleading standard to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Del. Ct. Chancery R. 23.1. Conclusory statements and

notice pleading are insufficient; the plaintiff must plead "particularized factual statements that are essential to the claim." *Brehm*, 746 A.2d at 254. A stockholder who makes a presuit demand tacitly concedes the independence of a majority of the board and the absence of futility. *Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990). The making of the demand places control of the derivative litigation in the hands of the board of directors. *Zapata Corp. v. Maldonado*, 430 A.2d 779, 784–86 (Del. 1981). As a result, in a demand refused case like this one, the board's decision is subject to the business judgment rule. *Spiegel*, 571 A.2d at 775.

The business judgment rule is "a presumption that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company [and its shareholders].'" *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001) (quoting *Aronson*, 473 A.2d at 812). "It is the essence of the business judgment rule that a court will not apply $^{20}/_{20}$ hindsight to second guess a board's decision, except in rare cases [where] a transaction may be so egregious on its face that the board approval cannot meet the test of business judgment." *Brehm*, 746 A.2d at 260.

In a demand refused case, a derivative plaintiff must plead facts sufficient to overcome the presumption of the business judgment rule as well as pleading facts sufficient to state a claim on the corporation's behalf. *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, CV 9714-VCG, 2015 WL

24

2270673, at *2 (Del. Ch. May 8, 2015), *aff'd sub nom. Ironworkers Dist. Council of Philadelphia v. Andreotti*, 132 A.3d 748 (Del. 2016). Because the derivative plaintiff who has made a demand has tacitly conceded the independence of the board, the only issues to be considered to overcome the business judgment rule are the good faith and reasonableness of the board's refusal. *See Spiegel*, 571 A.2d at 777–78; *Zapata Corp.*, 430 A.2d at 784 ("[A]bsent a wrongful refusal, the stockholder in such a situation simply lacks legal managerial power.").

C.   **The trial court correctly granted the pleas to the jurisdiction because Moody Jr. did not plead facts sufficient to overcome the business judgment rule.**

In his first issue on appeal, Moody argues that the court reversibly erred by granting the pleas to the jurisdiction. He states four subsidiary issues attacking the arguments made by the appellees in their pleas to the jurisdiction. We focus on the fourth, whether Moody satisfied the pleading requirements necessary to pursue a derivative action, and because we find that the trial court could have properly granted the pleas on that basis, we do not need to address his other arguments. *See* TEX. R. APP. P. 47.2.

### 1. Moody Jr. conceded the independence of the boards by making a presuit demand.

Moody argues that he pleaded sufficient facts to show the boards were not independent.[20] In this case, Moody Jr. presented a demand to National Western before filing suit, and the boards refused that demand. Because Moody Jr. made a presuit demand, he conceded the independence of the boards and placed control of the litigation in their hands. *See Spiegel*, 571 A.2d at 775; *Zapata Corp.*, 430 A.2d at 784–86. Moreover, "[t]o establish that a *board* was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the *individual members* of that board." *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). Moody Jr. did not allege facts pertaining to the interest or lack of independence of individual board members. *See id.* Accordingly, we conclude that his appellate argument that the boards were not independent lacks merit. *See id.*

---

[20] In particular, he relies on allegations in his live pleading that: (1) the boards did not appoint an independent committee to investigate his demand; (2) the directors, who were accused of wrongdoing, conducted the investigation with corporate counsel; (3) the directors face a substantial likelihood of personal liability for engaging in profitable but illegal activities; (4) the boards failed to conduct interviews of potential fact witnesses and reviewed few documents; (5) the board of National Western is comprised mostly of Moody family members, who are heavily influenced by Ross, and the family control was noted as a governance deficiency by Standard & Poor's in 2016.

**2. Moody Jr. did not plead particularized facts showing that the boards breached their duty of good faith.**

The fiduciary duty of loyalty encompasses both the duty to be disinterested and independent as well as the duty of good faith. *Cf. Orman*, 794 A.2d at 23. On appeal, Moody Jr. argues about the boards' lack of independence. He does not, however, articulate an argument that the boards breached their duty of good faith by, for example, acting for some purpose other than a genuine attempt to advance corporate welfare. *See Gagliardi*, 683 A.2d at 1051 n.2. Instead, Moody Jr. relies on the same evidence and analysis to argue that the boards did not act with due care and that they acted in bad faith.

More important, Moody Jr. did not plead particularized facts showing that the directors breached their duty of good faith. Moody Jr. makes numerous conclusory and speculative statements in his pleading suggesting the directors may have been motivated by some interest other than a genuine attempt to advance the best interest of the corporations. None of these statements, however, satisfy the heightened pleading standard that required Moody Jr. to plead particularized facts showing that the boards acted in bad faith by refusing his demand.[21] *See* Del. Ct. Chancery R. 23.1; *Brehm*, 746 A.2d at 254.

---

[21]    The following statements from Moody Jr.'s pleading are examples of these conclusory statements:

Moreover, "[d]emonstrating that directors have breached their duty of loyalty by acting in bad faith goes far beyond showing a questionable or debatable decision on their part." *Ironworkers*, 2015 WL 2270673, at \*27. "In order to adequately allege bad faith demand refusal, a complaint must plead particularized facts showing that 'the directors . . . acted with scienter, *i.e.*, with a motive to harm, or with indifference to harm that will necessarily result from the challenged decision—here, that decision being rejection of the Plaintiff's demand.'" *Andersen v. Mattel, Inc.*, CV 11816-

- National Western "did not take any of the actions which might reasonably be anticipated in view of the gravity of the charges."
- "It is a shocking indictment of the conduct of the Boards, which could only be motivated by their desire to protect themselves in spite of what is in the best interests of the companies."
- "[N]o one on the Boards was independent."
- The boards were "heavily influenced by the Moody family."
- The boards disregarded the governance deficiency that had been noted by Standard & Poor's "in favor of their own interests."
- The absence of an investigation report "raises a reasonable inference that the Boards did not want a thorough and independent committee to investigate and report on its findings, which would show the Boards['] wrongdoing."
- "The very Boards that decided to engage in the unlawful business, conducted in Brazil throughout the 2000's, has now decided it is not in the company's best interest to pursue claims for losses arising from their misconduct."
- "Consequently, the Boards' decision to refuse the Plaintiff's April 17, 2017, demand, could not be independent and disinterested because they were, at all times personally involved and vested in these transactions."
- "Accordingly, the evidence will show that National Western's refusal of the Plaintiff's Demand was improper because the refusal was not based upon a disinterested, thorough, and impartial analysis of the misconduct alleged by Plaintiff, Robert L. Moody, Jr."

VCMR, 2017 WL 218913, at *5 (Del. Ch. Jan. 19, 2017). Moody Jr. did not plead with particularity facts showing that the directors acted with motive to harm or with reckless indifference when they voted to refuse his demand.

**3.      Moody Jr. did not plead particularized facts showing that the boards breached their duty of care.**

Moody Jr. argues that the directors breached their fiduciary duty of care by failing to conduct a sufficient and independent investigation of the matters in his demand. Specifically, he argues that: (1) the boards did not secure independent advice about the legality of their practices and relied on advice of counsel about the legality of sales to residents of Argentina and Russia; (2) the boards did not interview any witnesses; (3) the boards considered only a package of materials provided to them at the joint board meeting; (4) the boards disregarded prior inquiries about their sales to residents of Argentina and Russia that raised red flags about their international business; and (5) the boards issued no investigation report or written analysis of their findings.

First, Moody Jr.'s pleading includes many conclusory statements that do not satisfy the heightened pleading burden under Rule 23.1.[22] *See* Del. Ct. Chancery R.

---

[22]      Moody Jr. included the following conclusory statements in his pleading regarding the alleged breach of the duty of care:

- "[B]ecause of fear of personal exposure and the significant influence of Ross Moody, the Boards did not independently, disinterestedly, or with due care in response to the Plaintiff's demand."

29

23.1; *Brehm*, 746 A.2d at 254. Other facts were pleaded based upon "information and belief."[23] Allegations pleaded on information and belief do not satisfy the

- "The Boards did not become sufficiently informed to make an independent business decision."

- "The Boards did not inform themselves of material information reasonably available to them and conducted such an inadequate investigation in light of the seriousness of the demand, that the Court should infer a breach of the Boards' duty of care."

- "The Boards were mere passive recipients of a presentation orchestrated by Ross Moody and counsel."

[23]     Some facts pleaded on information and belief include:

- "Upon information and belief, the company knew the facts found by SUSEP and affirmed by the Board of Appeals, and continued to operate in Brazil anyway."

- "Upon information and belief, the company knew or acted with reckless disregard as to whether its sales in Brazil were unlawful based upon any objective review of the facts and the law."

- "Upon information and belief, neither of the Boards, nor anyone on their behalf interviewed any of the current members of the Boards, the relevant current and former officers of the company, the current or former heads of international sales, or any of the advisors who played a role in the underlying events."

- "Upon information and belief, the Boards did not interview any of the Executive General Agents/Broker who manage the Company's distribution network of international independent agents or any of the independent agents."

- "Upon information and belief, the Boards did not consider the evidence illustrating National Western's unlawful conduct in Brazil that led the company to stop accepting applications in Brazil and other markets."

- "Upon information and belief, the Boards did not analyze the documentary history of the decisions to do business in Brazil."

- "Upon information and belief, the Boards engaged no reasoned consideration of the evidence in support of the demand."

30

heightened pleading requirement to plead with particularity. *Cf. Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 n.57 (Del. Ch. 2004) (rejecting allegations made on "information and belief" as insufficient to satisfy the burden to plead claims of fraud with particularity); *Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 23 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984).

Moody Jr. argues that the directors breached their duty of care by relying on opinions of counsel relating to sales to residents in other countries. The minutes of the June 6, 2017 joint board meeting, which was attached to the director-defendants' plea to the jurisdiction, showed that the boards considered the opinions of in-house counsel and Brazilian counsel, both of which concluded National Western had not acted unlawfully by selling life insurance to residents of Brazil. The minutes also noted that the boards had historically relied on and followed advice of counsel. Moody Jr.'s argument is that it was improper for the boards to rely on advice of counsel.

To satisfy the pleading requirement of Rule 23.1 in a case alleging breach of the duty of care in which

> an expert has advised the board in its decisionmaking process, the complaint must allege particularized facts (not conclusions) that, if proved, would show, for example, that: (a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with

31

reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter (in this case the cost calculation) that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the Board was so unconscionable as to constitute waste or fraud.

*Brehm*, 746 A.2d at 262. Moody Jr.'s live pleading does not meet these pleading requirements.

Moody also argues—and pleads—that the investigation was insufficient for lack of interviews, consideration of only certain documents, and failure to prepare a report of the investigation. These arguments and the factual allegations in the pleading are about the method the boards used to consider Moody Jr.'s demand. However, "while a board of directors has a duty to act on an informed basis in responding to a demand," "there is obviously no prescribed procedure that a board must follow." *Levine*, 591 A.2d at 200.

In addition, directors are required to "inform themselves, before making a business decision, of all material information reasonably available to them." *Benihana*, 891 A.2d at 192. Moody Jr. did not plead which specific facts could have been shown by the interviews he contends should have been conducted, nor did he make any such argument on appeal. In this case, all the parties agree that National Western sold insurance policies to residents of Brazil, without a Brazilian license, by accepting, through independent brokers, applications that were received in Texas

32

and issuing the policies in Texas. Moody Jr. contends that this was a violation of Brazilian law, based on the administrative penalty assessed by SUSEP and affirmed as modified by CRNSP. The directors, however, relying on advice of both U.S. and Brazilian counsel, maintained that National Western's business model did not violate Brazilian law because it did not operate in Brazil or sell insurance in Brazil. Moody Jr. has not shown how further investigation of facts would have informed the boards' decision to refuse his demand.

Finally, Moody Jr. pleaded that the boards failed to perform a detailed review of the ongoing Brazilian criminal investigation. He asserted that the directors breached their fiduciary duty by failing to conduct a meaningful analysis of the SUSEP opinion and by failing to investigate and refute the facts on which SUSEP based the fine. However, the issues in this case were based on facts that no party disputed. The boards took a legal position based on advice of counsel with which Moody Jr. disagreed. That is not evidence of breach of the duty of care. *See Caremark*, 698 A.2d at 967 (holding that compliance with directors' duty of care cannot be determined by considering correctness of board decision).

### 4. The defendants' jurisdictional evidence supports a finding that the directors complied with the business judgment rule.

In addition to considering Moody Jr.'s pleadings, we may also consider the defendants' jurisdictional evidence, which showed that the boards of National Western and Group met jointly, considered evidence regarding business practices in

33

Brazil, legal advice from counsel, the SUSEP and CRNSP decisions, and evidence of longstanding animosity between Moody Jr. and Ross. The boards also considered the fact of the ongoing criminal investigation and how acceding to Moody Jr.'s demands would affect National Western in that investigation. *See South v. Baker*, 62 A.3d 1, 25 (Del. Ch. 2012) (pursuing a derivative claim based on breach of the duty of care "during the pendency of the underlying litigation or governmental investigation may well compromise the corporation's position on the merits"). Having considered the available evidence that was material to Moody Jr.'s demands, the boards voted to refuse his demands, with Ross not participating in the vote. This jurisdictional evidence supports a finding that the business judgment rule applies in this case to bar Moody Jr.'s suit. *See Emerald Partners*, 787 A.2d at 90.

### 5. Moody Jr. was not entitled to supplement his pleading with facts that he learned during the litigation.

Finally, in the alternative, Moody Jr. argues that the trial court erred by denying him the opportunity to amend his pleading. He contends that while the pleas to the jurisdiction were pending, he learned that National Western had decided to end sales to non-U.S. residents. From that, he reasons that the directors acted in bad faith by denying his demands but later acceding to one of them.

In his April 2017 demand letter, Moody Jr. demanded that "National Western Life Insurance Group or its subsidiaries cease and desist from selling any insurance in any foreign jurisdiction without a proper license or authorization." Minutes from

34

the April 2018 meeting of the board of directors of National Western show that, due to "the various political, social, economic, and increasing regulatory issues impacting the markets," senior management recommended that the company "cease accepting applications for the Company's international products and instead focus the Company's resources on the development of the foreign nationals market."

The trial court denied Moody Jr.'s request to amend his pleading on the ground that amendment would be futile. We agree. Nothing in the facts that Moody Jr. alleges to have newly discovered would change the analysis on whether the directors satisfied the business judgment rule. *See Brehm*, 746 A.2d at 260 ("It is the essence of the business judgment rule that a court will not apply $^{20}/_{20}$ hindsight to second guess a board's decision . . . .).

\* \* \*

Having concluded that Moody Jr. failed to meet the heightened pleading requirement of Rule 23.1 to plead a claim for wrongful refusal of his demand, that the appellees demonstrated with unrebutted jurisdictional evidence that the boards' refusal of Moody Jr.'s demand was a valid exercise of sound business judgment, and that repleading would be futile, we hold that the trial court correctly granted the pleas to the jurisdiction. We overrule Moody Jr.'s first issue.

**II. The trial court did not abuse its discretion by awarding attorney's fees to National Western and Group.**

In his second issue, Moody Jr. challenges the trial court's award of attorney's fees to National Western and Group. Moody Jr. raises several subsidiary issues relating to the challenge to the attorney's fees award. Specifically, he argues that the court erred by: (1) denying an evidentiary hearing on whether the suit was filed without a reasonable basis or for an improper purpose; (2) taking judicial notice of the truth of the pleadings; (3) finding, without legally and factually sufficient evidence, that Moody filed the suit without reasonable cause or for an improper purpose; (5) finding, without legally and factually sufficient evidence, that Moody's filing of the shareholder derivative suit was the sole proximate cause of the defendants' fees; and (6) awarding unconditioned appellate fees.

## A.   Standard of review

"Texas has long adhered to the American Rule with respect to awards of attorney's fees, which prohibits the recovery of attorney's fees from an opposing party in legal proceedings unless authorized by statute or contract." *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013). "On termination of a derivative proceeding, the court may order . . . the plaintiff to pay expenses the corporation or other defendant incurred in investigating and defending the proceeding if the court finds the proceeding has been instituted or maintained without reasonable cause or for an improper purpose . . . ." TEX. BUS. ORGS. CODE §21.561(b)(2). We review a trial court's award of fees in a derivative action for an abuse of discretion. *See J.C.*

*Penney Co., Inc. v. Ozenne*, 453 S.W.3d 509, 512–13 (Tex. App.—Dallas 2014, pet. denied). A trial court abuses its discretion by acting in an arbitrary or unreasonable manner or without reference to any guiding rules or legal principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error; they are relevant factors in assessing whether the trial court abused its discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Ozenne*, 453 S.W.3d at 513. We consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of discretion. *J.J.G.*, 540 S.W.3d at 55; *Ozenne*, 453 S.W.3d at 513. No abuse of discretion occurs when there is some probative evidence to support the trial court's decision. *J.J.G.*, 540 S.W.3d at 55; *Ozenne*, 453 S.W.3d at 513.

When no findings of fact or conclusions of law are requested or filed, we imply all facts necessary to support the judgment that are supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Worford*, 801 S.W.2d at 109; *Ozenne*, 453 S.W.3d at 513. We will affirm the trial court's judgment if it can be upheld on any legal theory finding support in the evidence. *Worford*, 801 S.W.2d at 109; *Ozenne*, 453 S.W.3d at 513.

**B.** **Moody Jr. did not preserve error regarding either the summary determination of attorney's fees or evidentiary objections.**

Moody Jr. argues on appeal that the trial court erred by failing to hold an evidentiary hearing on the defendants' application for attorney's fees. He also challenges the text messages that were attached to the pleas to the jurisdiction as being unauthenticated. "Generally, to preserve a complaint for appellate review: (1) a party must complain to the trial court by a timely request, objection, or motion; and (2) the trial court must rule or refuse to rule on the request, objection, or motion." *Mansions in the Forest, L.P. v. Montgomery Cty.*, 365 S.W.3d 314, 317 (Tex. 2012) (citing TEX. R. APP. P. 33.1(a)). Moody Jr. did not get a ruling on any request for a trial or evidentiary objection. Therefore, those complaints are not preserved for appellate review. *See id.*

**C. Probative evidence supports the trial court's implied finding that Moody Jr.'s suit was filed without reasonable cause and was filed for an improper purpose.**

Moody Jr. argues that the evidence does not support a finding that he filed his lawsuit without reasonable cause or for an improper purpose. Although the trial court did not issue findings of fact or include a fact finding on improper purpose in the final judgment, we imply a finding that the suit was brought without reasonable cause if it is supported by the record. *See BMC Software*, 83 S.W.3d at 795; *Worford*, 801 S.W.2d at 109; *Ozenne*, 453 S.W.3d at 513. In this case, it is.

38

Section 21.561(b)(2) permits a court to order an award of attorney's fees if it finds that the suit was either instituted without reasonable cause or for an improper purpose. TEX. BUS. ORGS. CODE §21.561(b)(2). After responding to Moody Jr.'s demand letter, National Western and Group permitted Moody Jr.'s counsel to examine the materials that the boards reviewed at the joint meeting to consider his demand. When he filed suit, Moody Jr. was aware that the boards had met and considered material information and determined that initiating a suit would injure the company and the shareholders.[24]

Moody Jr. was also aware that National Western was under criminal investigation and that it had relied on advice of U.S. and Brazilian legal counsel in maintaining that it did not operate in Brazil and that its activities were lawful. This should have put him on notice that filing suit accusing the directors of unlawful action could harm National Western and Group shareholders by contradicting the company's position. *See South*, 62 A.3d at 23–24 (pursuing derivative claim "during

---

[24] The letter sent in response to Moody Jr.'s demand letter stated: "The Directors are firmly of the belief that no benefit to National Western could come from their authorizing the company to file a lawsuit challenging [National Western's] own conduct and business model as illegal, particularly where, as here, the Boards believe in good faith that [National Western's] busines model is legal. Such a lawsuit would injure [National Western] and damage [Group's] shareholders by effectively eliminating [National Western's] issuance of policies to citizens of other countries—a highly profitable part of [National Western's] business."

the pendency of underlying litigation or a governmental investigation may well compromise the corporation's position on the merits").

In addition, reasonable presuit inquiry would have revealed that National Western had not concealed the Brazilian fine from its stockholders and that it had already begun disengaging from the practice of selling insurance to non-U.S. residents, including Brazilians. Both of these matters were documented in the materials reviewed by the boards before they rejected Moody Jr.'s demand and provided to Moody Jr. before he filed suit.

In this case, the evidence shows that a reasonable presuit inquiry would have revealed that there was no basis in fact to allege that rejection of Moody Jr.'s demand was a result of gross negligence. *See Hughes v. Hous. Nw. Med. Ctr., Inc.*, 680 S.W.2d 838, 843 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (holding, under predecessor statute with identical fee shifting language, that evidence was sufficient to show that suit was initiated without reasonable cause because "[a] reasonable inquiry by plaintiffs before suit would have revealed no reasonable cause to bring a derivative suit"); *Bass v. Walker*, 99 S.W.3d 877, 885 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding, under predecessor statute with identical fee shifting language, that plaintiff initiates suit without reasonable cause when his claims are not warranted by existing law or good faith argument for

extension, modification or reversal of existing law or when his allegations are not well grounded in fact after reasonable inquiry).

The evidence also supports a finding that the suit was filed for an improper purpose. First, text messages from Moody Jr. to Ross and Moody-Dahlberg that were attached to the pleas to the jurisdiction described, in sometimes caustic and vulgar language, Moody Jr.'s disappointment and anger over being excluded from a position as trustee of the Moody Foundation. *See Pace v. Jordan*, 999 S.W.2d 615, 626 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (considering summary judgment evidence regarding the business judgment rule to determine whether trial court abused its discretion by denying attorney's fees under predecessor statute for derivative suits). The text messages also described Moody Jr.'s preoccupation with serving in a high position with the Moody Foundation or the Moody Endowment. In addition, the text messages included his heated response when he learned that certain recreational benefits associated with business travel had been discontinued. After that, he threatened to file a derivative suit regarding National Western.

Second, in January 2017, before sending the demand letter, Moody Jr. sent a letter to letter to Ross and National Western. The letter accused Ross of engaging in unlawful conduct in connection with sales of insurance to non-U.S. citizens. Moody

41

Jr.'s accusations were not limited to matters involving National Western.[25] Moody asked a number of questions that were not related to National Western, sales of life insurance to residents of foreign countries, or the SUSEP fine. Instead, he asked about the audit committee, the Moody Foundation, other Moody family-related entities, and communications with other family members. Although his accusations and questions cast a wide net, Moody Jr. concluded by threatening a derivative lawsuit and "initiation of litigation" by "multiple law firms, both in Texas and internationally" that had already been retained. In April 2017, Moody initiated the derivative lawsuit.

The text messages and the January 2017 letter are some probative evidence that supports to support the trial court's implied finding that the suit was brought for an improper purpose. *See J.J.G.*, 540 S.W.3d at 55; *Ozenne*, 453 S.W.3d at 513.

**D.      Probative evidence supports a conclusion that fees awarded were incurred in investigating and defending the proceeding.**

Moody Jr. argues that there is no or insufficient evidence of a connection between the amount of the fees awarded and his derivative suit. In particular, he asks the court to impose an extra-statutory requirement that there be a nexus between the improper conduct and the fees awarded. In particular, he questions: "Why did National Western and the Directors litigate Moody's lawsuit seeking National

---

[25]     "This is not the kind of leadership which the Moody *family* can tolerate." (Emphasis added.)

Western's withdraw[al] from the international market" between September 2017 and May 2018 when National Western "had already decided to stop issuing policies to foreign citizens?" He asserts that it was the actions of the defendants that prolonged the litigation and increased expenses.

We have already explained, however, that a reasonable presuit investigation would have revealed that National Western had already begun to disengage from selling insurance to non-U.S. residents because that information had been publicly disclosed in SEC filings and that it had validly exercised sound business judgment when it refused Moody's demand. Moreover, Moody Jr.'s demand letter asked for more than the cessation of issuance of insurance policies to non-U.S. residents. Among other things, it requested the removal of Ross from his positions in the companies and initiation of lawsuit against the board of directors.

The defendants' attorneys' affidavits specifically stated that the contemporaneous invoices reflect the amount of time and fees that were reasonably necessary to represent the defendants. The detailed contemporaneous billing invoices showed that the legal work was conducted to investigate and defend Moody Jr.'s suit. To the extent that Moody Jr. now attempts to object to the affidavits, such objection is waived by his failure to obtain a ruling from the court. *See Mansions in the Forest*, 365 S.W.3d at 317; TEX. R. APP. P. 33.1.

### E. The trial court should have conditioned the award of appellate attorney's fees on success.

Moody Jr. argues that the trial court erred by awarding the defendants appellate attorney's fees not conditioned on success on appeal. We agree. "An unconditional award of appellate attorney's fees is improper." *Austex Tree Serv., Inc. v. UniFirst Holdings, Inc.*, No. 01-18-00050-CV, 2019 WL 2621732, at *9 (Tex. App.—Houston [1st Dist.] June 27, 2019, no pet.) (mem. op.); *Ansell Healthcare Prods., Inc. v. United Med.*, 355 S.W.3d 736, 745 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). The appellees have conceded error on this subsidiary issue. "Since an unconditional award of appellate attorney's fees does not require reversal, we may modify a trial court's judgment to make the award of appellate attorney's fees contingent upon the receiving party's success on appeal." *Austex Tree Serv.*, 2019 WL 2621732, at *9; *see Ansell*, 355 S.W.3d at 745. Accordingly, we hold that the trial court erred by awarding "the reasonable and necessary appellate fees set forth in the Court's November 14, 2018 Order in the event that Plaintiff appeals this judgment." We sustain Moody Jr.'s second issue in part, and we modify the judgment as follows:

2. It is further ORDERED that Plaintiff Robert L. Moody, Jr. pay to National Western Life Insurance Co. and National Western Life Group, Inc. the following sums:

(a) Reasonable and necessary appellate attorneys' fees of $250,000.00 in the event of an appeal to the intermediate court of appeals unless Moody Jr. prevails in the court of appeals and petition for review is not granted by the Texas Supreme Court or unless Moody Jr. prevails in the Texas Supreme Court.

44

(b) Reasonable and necessary appellate attorneys' fees of $65,000.00 in the event of any appeal involving briefing related to a petition for review at the Texas Supreme Court unless Moody Jr. prevails in the Texas Supreme Court.

(c) Reasonable and necessary appellate attorneys' fees of $125,000.00 in the event of any merits briefing at the Texas Supreme Court (whether before or after a petition for review is granted) unless Moody Jr. prevails in the Texas Supreme Court.

(d) Reasonable and necessary appellate attorneys' fees of $65,000.00 in the event of any oral argument and related procedures at the Texas Supreme Court if a petition for review is granted unless Moody Jr. prevails in the Texas Supreme Court.

## III. The trial court did not err by dismissing Moody Jr.'s contract claim because it was not justiciable.

On appeal, Moody Jr. argues that the trial court erred by dismissing his claim for declaratory judgment regarding the managing general agent contract. On appeal, he argues that his counterclaim was not moot because it had greater ramifications than the defendants' nonsuited claim for breach of contract.

"A declaratory judgment is available only when there is a justiciable controversy between the parties." *Hous. Chronicle Publ'g Co. v. Thomas*, 196 S.W.3d 396, 401 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004)). "A declaratory-judgment action does not give a court jurisdiction 'to pass upon hypothetical or contingent situations, or to determine questions not then essential to the decision of an actual

45

controversy, although such questions may in the future require adjudication.'" *Tesco Corp. (US) v. Steadfast Ins. Co.*, No. 01-13-00091-CV, 2015 WL 456466, at *2 (Tex. App.—Houston [1st Dist.] Feb. 3, 2015, pet. denied) (mem. op.) (quoting *Bexar Metro. Water Dist. v. City of Bulverde*, 234 S.W.3d 126, 130–31 (Tex. App.—Austin 2007, no pet.)). "Justiciability is a matter of concern in every civil case and remains a live concern from the first filing through the final judgment." *Heckman*, 369 S.W.3d at 147. For an issue to be justiciable, "there must be a real controversy between the parties that will be actually resolved by the judicial relief sought." *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994).

In the trial court, Moody Jr. argued that dismissal of his declaratory judgment counterclaim would deny him due process because his request for interpretation of the managing general agent contract was not related to the shareholder derivative suit and because "other controversies may arise involving this contract." He argued that interpretation of the contract had "ramifications entirely separate from" his right to bring a shareholder derivative suit. Because the only ramification identified in the trial court or on appeal is the potential for future controversies to arise involving the contract, we conclude that Moody Jr.'s declaratory judgment claim was no longer a live controversy after the court granted the pleas to the jurisdiction. Because resolution of the declaratory judgment claim would require the trial court to determine a hypothetical or contingent question, the claim was no longer justiciable.

*See Tesco Corp.*, 2015 WL 456466, at \*2; *Bexar Metro. Water Dist.*, 234 S.W.3d at 130–31.

Accordingly, we hold that the trial court correctly dismissed Moody Jr.'s declaratory judgment claim. We overrule Moody Jr.'s third issue.

## Conclusion

We modify the judgment to condition the award of appellate attorney's fees on success in the appellate court, and as modified we affirm the trial court's judgment.

Peter Kelly
Justice

Panel consists of Justices Kelly, Goodman, and Countiss.